UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

| | |
|---|---|
| NORTHLAKE DEVELOPMENT, LLC, | CASE NO. 06-01934-NPO |
| DEBTOR. | CHAPTER 7 |
| KINWOOD CAPITAL GROUP, LLC AND GEORGE KINIYALOCTS, INDIVIDUALLY AND AS GENERAL PARTNER OF KINIYALOCTS FAMILY PARTNERS I, LTD. | PLAINTIFFS |
| V. | ADV. PROC. NO. 06-00171-NPO |
| NORTHLAKE DEVELOPMENT, LLC AND BANKPLUS | DEFENDANTS |

MEMORANDUM OPINION AND ORDER
GRANTING AMENDED COMPLAINT

There came on for trial (the "Trial") the Amended Complaint (Adv. Dk. No. 25) filed by Kinwood Capital Group, LLC and George Kiniyalocts, Individually and as General Partner of Kiniyalocts Family Partners I, Ltd. (the "Plaintiffs") and the Answer of BankPlus to Amended Complaint (the "Answer") (Adv. Dk. No. 27) filed by BankPlus ("BankPlus") in the above-styled adversary proceeding (the "Adversary").[1] James R. Mozingo and William M. Simpson represented the Plaintiffs. Edward E. Lawler and R. Keith Foreman represented BankPlus. The Court, having considered the pleadings and briefs as well as the testimony, exhibits, and arguments of counsel

---

[1] Defendant Northlake Development, LLC ("Northlake") did not file an Answer to the Amended Complaint, and the chapter 7 trustee, Derek A. Henderson ("Trustee"), did not participate in the Trial. Therefore, the final judgment entered in this Adversary applies to both Defendants, Northlake and BankPlus.

presented at Trial, finds that the Amended Complaint is well taken and should be granted as set forth herein. Specifically, the Court finds as follows:[2]

## Jurisdiction

This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H) and (K). Notice of the Trial on the Amended Complaint was proper under the circumstances.

## Facts

**I. The following facts are included in the Pretrial Order (Adv. Dk. No. 79) approved by the Court after conference with the parties unless otherwise noted:**

### A. First Bankruptcy Case

1. Northlake filed in this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 18, 2005, which was assigned case no. 05-04348 (the "First Bankruptcy Case") (First Case Dk. No. 1). Michael Earwood ("Earwood") signed the petition as both attorney for Northlake and managing member of Northlake. Northlake listed certain property located in Panola County, Mississippi (the "Property"), as property of the estate in the First Bankruptcy Case (First Case Dk. No. 16).

2. During the pendency of the First Bankruptcy Case, Earwood, the sole owner and managing member of Northlake, and Thomas R. Hudson ("Hudson"), general counsel for BankPlus, entered into an agreement whereby Northlake would pay delinquent ad valorem taxes on the Property, maintain hazard and fire insurance on the improvements on the Property, and make adequate protection payments to BankPlus. The agreement was memorialized in an Order entered

---

[2] The following constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

by the Court on November 7, 2005 (First Case Dk. No. 31), which called for the automatic stay to terminate if Northlake defaulted. On June 13, 2006, Hudson filed an Affidavit of Default (First Case Dk. No. 56), and the automatic stay purportedly terminated as to the Property by operation of law due to Northlake's default.

3. On November 15, 2005, the Court disqualified Earwood as attorney for the Debtor-in-Possession in the First Bankruptcy Case based on his lack of disinterestedness (First Case Dk. No. 32).

4. The First Bankruptcy Case was dismissed by Agreed Order on June 28, 2006 (First Case Dk. No. 58). The Court entered the Final Decree/Order Closing Case on September 25, 2006 (First Case Dk. No. 64).

### B. Second Bankruptcy Case

1. On September 14, 2006, on the eve of foreclosure by BankPlus, Northlake filed in this Court a second voluntary petition for relief under chapter 11 of the Bankruptcy Code, which was assigned case no. 06-01934 (the "Second Bankruptcy Case") (Second Case Dk. No. 1). Earwood signed the petition as managing member of Northlake, and Robert B. Childers ("Childers"), who practiced law with Earwood, signed the petition as attorney for Northlake. Id. The petition, however, neither listed the law firm name of Earwood & Childers, PLLC nor indicated that Earwood and Childers were in the same law firm. Id.

2. In the Second Bankruptcy Case, Northlake again listed the Property as property of the estate (Second Case Dk. No. 91).

3. On October 23, 2006, the Court entered an Order Granting Disqualification Motion (Second Case Dk. No. 40) which disqualified Earwood & Childers, PLLC, Earwood, and Childers from representing Northlake in the Second Bankruptcy Case.

4. Also on October 23, 2006, the Court converted Northlake's chapter 11 case to a case under chapter 7 (Second Case Dk. No. 41), and subsequently, the United States Trustee appointed the Trustee.

5. On November 3, 2006, the Court sanctioned Earwood, Childers, and Earwood & Childers, PLLC, jointly and severally, and ordered them to pay $2,182.50 in attorney's fees to BankPlus (Second Case Dk. No. 53) in connection with its Motion for Relief from Automatic Stay (Second Case Dk. No. 6).

### C. The Adversary

1. Kinwood Capital Group, LLC ("Kinwood") is a Mississippi limited liability company formed on or about March 20, 1998 (Pretrial Order; Ex. P-2). Kinwood's initial members were George Kiniyalocts, an adult resident citizen of the State of Ohio and owner of eighty percent (80%) of the ownership interest of Kinwood, and Earwood, owner of twenty percent (20%) of the ownership interest of Kinwood (Pretrial Order; Exs. P-2 and P-4). Subsequently, George Kiniyalocts conveyed his interest in Kinwood to a family limited partnership, Kiniyalocts Family Partners I, Ltd., and has been its General Partner (Pretrial Order; Ex. P-7; Trial Tr. Vol. 1 at 188-189).[3] Kiniyalocts also transferred an additional five percent (5%) of the ownership interest in Kinwood to Earwood[4] (Trial Tr. Vol. 1 at 45)[5].

---

[3] Hereinafter, Kiniyalocts and Kiniyalocts Family Partners I, Ltd. are referred to collectively as "Kiniyalocts" unless otherwise stated.

[4] At all times relevant hereto Kiniyalocts has owned at least seventy-five percent (75%) of the membership interest of Kinwood.

[5] Since the Trial lasted three days, the Trial Transcripts will be identified as follows: Vol. 1 is the transcript of Wednesday, October 31, 2007; Vol. 2a is the transcript of Thursday morning, November 1, 2007; Vol. 2b is the transcript of Thursday afternoon, November 1, 2007; Vol. 3 is the transcript of Friday, November 2, 2007.

2. Northlake is a Mississippi limited liability company formed on or about June 27, 2000, whose sole owner and managing member is Earwood, an adult resident citizen of the State of Mississippi and an attorney with Fox, Earwood & Childers and, later, Earwood & Childers, PLLC (Pretrial Order; Ex. P-21; Trial Tr. Vol. 1 at 42).

3. BankPlus is a Mississippi banking corporation and a creditor of Northlake (Pretrial Order; Answer of BankPlus at ¶3).

4. On October 11, 2006, Plaintiffs filed this Adversary against Northlake and BankPlus asserting ownership of the Property and, *inter alia*, seeking to enjoin BankPlus from foreclosing on its purported security interest in the Property pending a determination of ownership (Adv. Dk. No. 1).

5. The Court granted a Temporary Restraining Order on October 16, 2006 (Adv. Dk. No. 12), and an Agreed Preliminary Injunction on November 15, 2006 (Adv. Dk. No. 23), which, in part, enjoined BankPlus from conducting a foreclosure sale on the Property and enjoined Northlake and Earwood from further conveying or encumbering the Property.

6. The Plaintiffs filed the Amended Complaint on December 14, 2006 (Adv. Dk. No. 25), and BankPlus filed its Answer on December 15, 2006 (Adv. Dk. No. 27).

### D. Kinwood Background

1. Kinwood was at all pertinent times a member-managed limited liability company (Exs. P-2, 4). Kinwood's Certificate of Formation was filed with the Secretary of State by Earwood on behalf of Kinwood. The Certificate of Formation listed no restrictions in Paragraph 7 (Ex. P-2). Kinwood's Operating Agreement (the "Kinwood Operating Agreement") was never recorded (Pretrial Order).

2. On March 12, 1998, Kinwood acquired title to the Property at a foreclosure sale from the Trustee of First Security Bank for a price of $535,001 (Pretrial Order; Ex. P-3). The Property consists of approximately five hundred twenty (520) acres and improvements thereon located in the First Judicial District of Panola County, Mississippi (Pretrial Order; Ex. P-3). In order for Kinwood to acquire the Property, Kinwood, George Kiniyalocts and Earwood became indebted to Mellon Bank ("Mellon") for the sum of approximately $575,000 (Pretrial Order; Ex. P-5; Trial Tr. Vol. 1 at 160, 162-163). All three parties remain liable for said indebtedness (Pretrial Order; Trial Tr. Vol. 1 at 163). The Property was not pledged to secure the debt to Mellon, and after its purchase, no lien was placed against the Property by Kinwood (Pretrial Order; Ex. P-5; Trial Tr. Vol. 1 at 162-163; Trial Tr. Vol. 2a at 32).

### E. Kinwood, Earwood and Novus Transactions

1. On April 7, 1998, $39,919 from the proceeds of the Mellon loan was deposited to the Kinwood bank account (Ex. P-74; Trial Tr. Vol. 1 at 84). In addition to the initial deposit of Mellon loan proceeds, Kiniyalocts transferred various amounts to Kinwood including $16,000 on August 26, 1998; $12,800 on November 13, 1998; $41,899.50 on August 28, 2000; $36,525 on August 31, 2000; $12,000 on June 9, 2005; and $25,000 on August 12, 2005 (Exs. P-74, 76; Trial Tr. Vol. 1 at 91, 137-139). During 1999, Gary Light paid Kinwood $50,000 in earnest money in connection with contracts to purchase the Property (*see* section I.F. below; Trial Tr. Vol. 1 at 122-124).

2. Prior to Kinwood's formation, Earwood had formed a limited liability company, Novus Capital Fund, LLC ("Novus"), on January 29, 1998 (Pretrial Order; Ex. P-1; Trial Tr. Vol. 1 at 66). During 1998, Earwood transferred $34,776.12 from the Kinwood account to his Novus account (Ex. P-74; Trial Tr. Vol. 1 at 88). During 1999, Earwood transferred $115,505.87 from the

Kinwood account to his Novus account (Ex. P-74; Trial Tr. Vol. 1 at 89). In 2000, Earwood transferred $37,000 from Kinwood's account to the Novus account (Ex. P-74). In 2001, Earwood transferred $1,000 from Kinwood to Novus and $13,387.65 from Kinwood to Northlake. Id. In 2003, Earwood transferred $25,600 from Kinwood to Novus, $12,025 from Kinwood to Northlake, $300 from Kinwood to his son; and $1,865 from Kinwood to himself. Id.

3. Prior to Kinwood's purchasing the Property, certain lots in and around the Property had been sold to third parties. Kinwood's business plan included repurchasing those lots. Earwood used Kinwood funds to repurchase the lots but titled them in the name of Novus, not Kinwood (Trial Tr. Vol. 1 at 92).[6]

### F. Gary Light Contracts

1. In 1999, Kinwood entered into a series of contracts to sell all or substantially all of the Property to Gary Light and his limited partnership, Southern Trace Golf Development, LP ("Light I") (Pretrial Order; Ex. P-13; Trial Tr. Vol 2a at 36-37).

2. As a way to assist Gary Light with his attempts to secure financing to purchase the Property, Kinwood proposed a scenario, included in the Light I contracts, whereby Kinwood would retain a 70 - 80 acre tract of land (the "Proposed Carve-Out") for development by Kinwood (Ex. P-13; Trial Tr. Vol. 2a at 37).

3. On or about July 12, 2000, Earwood, on behalf of Northlake, entered into new contracts for the sale of all or substantially all of the Property to Gary Light and Southern Trace Golf Development, LP ("Light II") (Pretrial Order; Ex. P-25; Trial Tr. Vol. 1 at 126). The Seller listed

---

[6] Since Novus is not a party to this Adversary, no relief is granted herein as to those lots.

in Light II was Northlake and not Kinwood. Id. The Proposed Carve-Out also was included in the Light II contracts which Northlake entered into with Gary Light. Id.

### G. Northlake and BankPlus

1. On June 27, 2000, Earwood formed Northlake with himself as sole owner and managing member. Earwood was also Registered Agent for service of process for Northlake (Pretrial Order; Ex. P-21; Trial Tr. Vol. 1 at 170-171).

2. On July 12, 2000, Earwood executed on behalf of Kinwood a warranty deed purportedly conveying the Property from Kinwood to Northlake (the "Kinwood Warranty Deed") (Pretrial Order; Ex. P-30; Trial Tr. Vol. 1 at 44). The Kinwood Warranty Deed was recorded in the land records of the First Judicial District of Panola County, Mississippi (Deed Book B-21 at Page 717) on August 7, 2000. Id. A "Correction and Amendment to Warranty Deed" from Kinwood to Northlake was filed August 9, 2004 (Deed Book B-31 at 611) (Ex. P-56).[7]

3. Before the Light II sale was scheduled to close on October 10, 2000,[8] Earwood approached BankPlus regarding mortgaging the Property (Ex. P-25, Trial Tr. Vol. 2b at 57). BankPlus agreed to lend Northlake approximately $300,000 in exchange for a deed of trust on the Property (Exs. P-31, 33; Trial Tr. Vol. 2b at 58). Therefore, Earwood, on behalf of Northlake, executed a deed of trust (the "BankPlus Deed of Trust") in which he pledged Northlake's interest in the Property as collateral for the $300,000 loan. Id. Earwood also pledged Northlake's interest

---

[7] Earwood executed the Correction and Amendment to Warranty Deed in his purported capacity for both Kinwood and Northlake.

[8] Gary Light was never able to obtain financing, and the sale of the Property to Gary Light never closed.

in the Property as collateral for subsequent BankPlus loans (Exs. D-26, 27; Trial Tr.Vol. 2b at 88-90).

    4.    BankPlus did not obtain an outside appraisal of the Property in connection with the loan to Northlake but did obtain a copy of the Northlake Operating Agreement prior to the loan (Pretrial Order; Trial Tr. Vol. 2b at 58-59). BankPlus obtained a title certificate with regard to the Property from Fox, Earwood & Childers on August 10, 2000 (Pretrial Order; Ex. P-27; Trial Tr. Vol. 2b at 65-67). While Childers signed the title certificate, Earwood performed the actual title search, prepared the rough draft of the title certificate, and provided Childers with copies of documents he copied from the Panola County land records (Trial Tr. Vol. 2a at 11, Trial Tr. Vol. 2b at 66). The initial title certificate certified title to the Property in Northlake as of August 1, 2000 (Ex. P-27). On August 31, 2000, Fox, Earwood & Childers recertified title to the Property in Northlake subject to the BankPlus Deed of Trust (Ex. P-34).

## II. The following contested facts were determined at Trial:

    1.    By the terms of the Kinwood Operating Agreement, Earwood lacked the express authority to execute the Kinwood Warranty Deed on behalf of Kinwood without the approval of Kiniyalocts. *See supra* Discussion I.B.

    2.    The credible evidence at Trial demonstrated that Kiniyalocts never authorized Earwood to execute the Kinwood Warranty Deed on behalf of Kinwood, and Earwood knew he lacked the authority to execute the Kinwood Warranty Deed on behalf of Kinwood. *See supra* Discussion I.C.

    3.    Earwood did not tell Kiniyalocts a) that he had formed Northlake, b) that he had executed the Kinwood Warranty Deed from Kinwood to Northlake, c) that he had pledged the

Property as collateral for the BankPlus loans, or d) that BankPlus had initiated foreclosure on the Property, until September 2006, after he filed the Second Bankruptcy Case. *See supra* Discussion I.C.

**Issues**

1. Whether the Kinwood Warranty Deed conveyed title in the Property to Northlake.

2. Whether the BankPlus Deed of Trust created a valid security interest in the Property.

**Discussion**

**I.     The Kinwood Warranty Deed was void *ab initio* and did not convey title to Northlake.**

**A.     The Mississippi Limited Liability Act and related case law**

In 1994, Mississippi adopted the Mississippi Limited Liability Act. 1994 Miss. Laws Ch. 402 (codified at Miss. Code Ann. §§ 79-29-101 *et seq.*). A limited liability company ("LLC") is generally defined as:

> an unincorporated entity that is formed or organized through a filing with the state under a state limited liability company statute, the members and managers of which do not have vicarious liability for the obligations of the entity, and the relationship of the members, managers, and the entity is largely governed by an agreement among them or, where the parties have not agreed to the contrary, to the default rules of the state statute.

6 ENCYCLOPEDIA OF MISSISSIPPI LAW § 49.1 (Jeffrey Jackson & Mary Miller eds., 2001) (citing Ribstein & Keating on Limited Liability Companies, §1.03 (West 2001)). A Mississippi LLC is formed upon the filing of a Certificate of Formation with the Secretary of State. Miss. Code Ann. § 79-29-201. A Mississippi LLC may carry on any lawful business, purpose, or activity unless the Certificate of Formation sets forth limitations thereon. Miss. Code Ann. § 79-29-108; *see also* 6 ENCYCLOPEDIA OF MISSISSIPPI LAW § 49.7.

LLC members may execute an LLC Operating Agreement "to regulate or establish the affairs of the limited liability company, the conduct of its business and the relations of its members." Miss. Code Ann. § 79-29-306. "The Certificate of Formation is analogous to articles of incorporation in the corporation context, while an LLC Agreement [sometimes called an Operating Agreement] is analogous to a corporation's by-laws." 6 ENCYCLOPEDIA OF MISSISSIPPI LAW § 49.11 (citing Miss. Code Ann. § 79-29-103).

Unless the Certificate of Formation contains an affirmative election of management by managers, the LLC is member-managed. Miss. Code Ann. § 79-29-302. However, regardless of whether an LLC is manager-managed or member-managed, the Certificate of Formation or the LLC Agreement may impose restrictions on the powers and authority of those managing the LLC. Id. (emphasis added); *see also* 6 ENCYCLOPEDIA OF MISSISSIPPI LAW § 49.11. In a member-managed LLC, every member is an agent of the LLC and can bind the LLC unless the member, by operation of agreement or otherwise, has no actual agency authority, and the third party with whom he is dealing has knowledge of the lack of authority. Miss. Code Ann. 79-29-303; *see also* 6 ENCYCLOPEDIA OF MISSISSIPPI LAW § 49.20. "An act of a manager or member which is not apparently for the carrying on in the usual way the business of the limited liability company does not bind the limited liability company unless authorized in accordance with the limited liability company agreement." Miss. Code Ann. § 79-29-303(3). "No act of a manager or member in contravention of a restriction on authority shall bind the limited liability company to persons having knowledge of the restriction." Miss. Code Ann. § 79-29-303(4). The policy aim of the Mississippi Limited Liability Act is to "give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements." Miss. Code Ann. §79-29-1201(2).

With regard to contract construction generally, the United States District Court for the Northern District of Mississippi has held:

> [i]t is firmly entrenched in the jurisprudence of Mississippi that this court must . . . construe the written contract as made by the parties, giving the words of the document their commonly accepted meaning. If no ambiguity exists, this court must accept the plain meaning of the instrument as the intent of the parties and give effect to the instrument accordingly. The court recognizes that contracts are solemn obligations and the court must give them effect as written.

DeMarion Janitorial Serv. v. Universal Dev. Corp., 625 F. Supp. 1353, 1356 (N.D. Miss. 1985) (citing Freeman v. Continental Grain Co., 381 F.2d 459 (5th Cir. 1967)); *see also* Humble Oil and Refining Co. v. Standard Oil Co., 363 F.2d 945 (5th Cir. 1966); Allen v. Powell, 260 So. 2d 182 (Miss. 1972); Roberts v. Corum, 112 So. 2d 550 (Miss. 1959); Hamilton v. Transcontinental Gas Pipeline Corp., 110 So. 2d 612 (Miss. 1959). Other courts have held that "[a]n operating agreement is contractual in nature; thus, it binds the members of the LLC as written and is interpreted pursuant to contract law." *See e.g.* Kinkle v. R.D.C., LLC, 889 So. 2d 405, 409 (La. App. 3 Cir. 2004). This Court agrees and adopts the holding in Kinkle.

### B. The Structure and Operation of Kinwood

#### 1. The Operating Agreement

The Certificate of Formation filed with the Secretary of State indicates that Kinwood is a member-managed LLC, and was signed by Earwood as a "Member" of Kinwood (Ex. P-2). The Certificate of Formation lists no limitations on the purpose or powers of the business. Therefore, Kinwood may carry on any lawful business, purpose, or activity. Miss. Code Ann. § 79-29-108; *see also* 6 ENCYCLOPEDIA OF MISSISSIPPI LAW § 49.7. The testimony at Trial established that George Kiniyalocts and Earwood formed Kinwood to purchase and develop the Property for profitable resale (Trial Tr. Vol. 1 at 42; Vol. 2a at 27-28). The testimony also established that

Kinwood funds[9] were to be utilized in furtherance of that purpose (Ex. P-4; Trial Tr. Vol. 2a at 40, 74, 81, 83). George Kiniyalocts and Earwood, as Members of Kinwood, executed the Kinwood Operating Agreement which Earwood drafted (Ex. P-4; Trial Tr. Vol. 1 at 47). Article 4.1 of the Kinwood Operating Agreement states:

> Management in Members. The business and affairs of the Company shall be managed by the Members. All management decisions shall be by a vote of the Members owning a majority of the Membership Interests. Notwithstanding any provision in this Agreement to the contrary, the affirmative vote of Members holding at least Seventy-five percent (75%) of all Membership Interests shall be required to approve the sale, exchange, or other disposition of all, or substantially all, of the Company's assets (other than in the ordinary course of the Company's business) which is to occur as part of a single Transaction or plan.

(Ex. P-4). The Court finds that no ambiguity exists in Article 4.1 of the Kinwood Operating Agreement, and accepts the plain meaning of the provision as the intent of Earwood and Kiniyalocts.

At all times pertinent to the issues raised in this Adversary, Kiniyalocts owned 75-80% of Kinwood, and Earwood owned 20-25% of Kinwood. Id. By the terms of the Kinwood Operating Agreement, all management decisions were to be made by majority vote. Id. Since Kiniyalocts was the majority interest holder, all Kinwood management decisions required his approval. This Court does not have to decide if Earwood's attempted conveyance of the Property from Kinwood to Northlake was within the ordinary course of the Kinwood's business, in which case a majority vote was required, or was "other than in the ordinary course" of Kinwood's business, in which case a super-majority vote was required. In either case, Kiniyalocts's approval was required.

---

[9] As set forth more fully in the Facts section of this Memorandum Opinion and Order, the Kinwood funds were derived from various sources including the Mellon loan, George Kiniyalocts personally, and earnest money paid by Gary Light.

### 2. The Actual Operation of Kinwood

Although the purpose of Kinwood was to purchase and develop the Property for profitable resale, the evidence showed that Earwood engaged in a fraud wherein he converted Kinwood assets in the form of funds and the Property itself. As to the Kinwood funds, the Novus account bank statements demonstrated that Earwood used the funds he transferred from Kinwood into Novus to pay himself and numerous personal bills having no relation to Kinwood whatsoever (Exs. P-86, 87; Trial Tr. Vol. 1 at 98-103). For example, Earwood used the funds to pay his credit card bills, utility bills, household bills, car note, house note, personal loan notes and medical bills, among other things. Id.[10]

Earwood attempted to justify his conversion of Kinwood funds for personal use by testifying that a portion of the funds he transferred from Kinwood represented payment for past due attorney's fees (Trial Tr. Vol. 1 at 86). The bank records showed, however, that Earwood did not direct that money to the law firm of Fox, Earwood & Childers but instead into his own Novus account (Trial Tr. Vol. 1 at 96). Moreover, for at least some of the attorney's fees allegedly owed, the testimony at Trial also showed that Fox, Earwood & Childers had rendered legal services to Contech, George Kiniyalocts's former employer, not Kinwood (Trial Tr. Vol. 1 at 87). In addition, Earwood prepared Kinwood's tax returns and his own tax returns during the pertinent period. Yet, Kinwood's tax

---

[10] Not only did the evidence demonstrate that Earwood converted Kinwood funds, the evidence also established that Earwood converted BankPlus loan proceeds for his personal use. That is, the evidence showed that he converted BankPlus loan proceeds to purchase two vehicles, pay his daughter's sorority dues, give cash to his son, place money in his daughter's investment account, and pay his personal property and ad valorem taxes (Ex. P-86; Trial Tr. Vol. 1 at 65 - 73). Additionally, the evidence showed that Earwood directed $32,500 from the BankPlus proceeds into the Fox Earwood Trust Account. Earwood could offer no explanation for why he directed those funds to the trust account for his law firm. (Ex. P-86; Trial Tr. Vol. 1 at 71).

returns fail to indicate that Kinwood paid any legal fees to Earwood or Fox, Earwood & Childers (Exs. P-61, 63, 65, 67, 68, 69, 70; Trial Tr. Vol. 1 at 107, 109). Finally, Earwood's own tax returns fail to indicate that he received attorney's fees from Kinwood (Exs. P-83, 84; Trial Tr. Vol. 1 at 114-118). The Court thus finds Earwood's explanation unpersuasive since he failed to account for alleged legal fees.

Earwood alternatively attempted to justify his conversion of Kinwood funds for personal use by testifying that some of the funds he transferred from Kinwood to his Novus account represented compensation for the non-legal work he was performing on behalf of Kinwood (Trial Tr. Vol. 1 at 77, 94-95, 97-98). Earwood, however, failed to disclose on the financial statements and reports which he prepared and sent to Kiniyalocts that he was compensating himself out of Kinwood funds (Exs. P-62, 64, 66, 71, 73). Additionally, Earwood failed to account for such compensation out of Kinwood funds on the tax returns he prepared and filed for himself (Exs. P-83, 84). Moreover, testimony by Kiniyalocts persuasively showed that Earwood was not entitled to nor paid a salary because Earwood's time and effort represented his contribution to Kinwood in lieu of a capital contribution (Trial Tr. Vol. 2a at 41). Again, the Court finds Earwood's explanation unpersuasive since he failed to account for alleged non-legal compensation.

Therefore, despite Earwood's self-serving and inconsistent explanations, the evidence at Trial revealed that he did not utilize Kinwood funds to further the purpose of purchasing and developing the Property. Instead he converted a substantial portion of Kinwood funds to his own use. When Earwood realized that Kinwood would receive no additional funding and Kiniyalocts would guarantee no additional financing, Earwood converted the Property itself by executing and filing the Kinwood Warranty Deed and pledging the Property to BankPlus.

### C. Earwood lacked express authority to transfer the Property from Kinwood to Northlake

Based on the restrictions in Article 4.1 of the Kinwood Operating Agreement, Earwood had no express authority to execute the Kinwood Warranty Deed without the approval of Kiniyalocts (Ex. P-4). On July 12, 2000, however, Earwood executed the Kinwood Warranty Deed, which purported to convey the Property from Kinwood to Northlake, as "Managing Member" of Kinwood even though he had no such designation pursuant to the Kinwood Certificate of Formation or the Kinwood Operating Agreement (Exs. P-2, 4, 30). Furthermore, Northlake gave no valuable consideration, such as cash payment, transfer of property, promissory note, or deed of trust, to Kinwood in exchange for the Kinwood Warranty Deed (Trial Tr. Vol.1 at 56-57).

The central fact question at Trial, therefore, was whether Kiniyalocts gave Earwood authority to transfer the Property to Northlake on behalf of Kinwood. The Court finds that Kiniyalocts did not. Earwood testified that Kiniyalocts told him to do "what was necessary to advance the project" (Trial Tr. Vol. 1 at 50). Yet, Earwood admitted he had been told by Kiniyalocts that with respect to the Property a) he was not interested in developing the Proposed Carve-Out, b) he was not going to borrow any additional funds, c) he was not going to guarantee any further financing, and d) he would not "go out on the limb any further" (Trial Tr. Vol. 1 at 78).

Earwood also testified that he did not tell Kiniyalocts about the existence of Northlake, the Kinwood Warranty Deed, or the recording of the Kinwood Warranty Deed during the pertinent period of time (Trial Tr. Vol. 1 at 50-51). Earwood further admitted that he did not tell Kiniyalocts that he was pledging the Property as security for the loan(s) from BankPlus (Trial Tr. Vol. 1 at 56). Additionally, Earwood offered no explanation for why it was necessary to convey and then pledge all 520 acres of the Property to secure funding to develop the 70-80 acres of the Proposed Carve-Out

of which, according to the Kinwood Operating Agreement, Earwood would have only a twenty-five (25%) interest.

Thus, despite significant persuasive evidence to the contrary, Earwood would have the Court believe the absurd proposition that he and Kiniyalocts had a clear agreement in which Earwood had express authority to transfer the Property, Kinwood's only asset, to Earwood's wholly-owned Northlake for no consideration and with no apparent interest retained by Kinwood in the Property,[11] and then pledge the Property as security for the BankPlus loan. Like Earwood's self-serving and inconsistent justifications for his use of Kinwood funds (*see supra* Section I.B.2.), the Court finds equally unpersuasive Earwood's justifications regarding his alleged authority to transfer the Property.

### D. Earwood lacked apparent authority to transfer the Property from Kinwood to Northlake

Additionally, Earwood had no apparent authority to execute the Kinwood Warranty Deed. "There are three essential elements to apparent authority: (1) acts or conduct of the principal; (2) reliance thereon by a third person; and (3) a change of position by the third person to his detriment. All must concur to create apparent authority." Alexander v. Tri-County Coop, 609 So. 2d 401, 403

---

[11] Nevertheless, Earwood repeatedly testified that Kinwood retained a "beneficial interest" in the Property after his attempted conveyance to Northlake (Trial Tr. Vol. 1 at 133, 135, 140). However, Earwood failed to identify Kinwood or any "beneficial interest" Kinwood held in the Property anywhere on the Statement of Financial Affairs, Summary of Schedules, or any documents Earwood prepared and signed under oath as Managing Member of Northlake and signed as attorney for Northlake when Northlake filed its First Bankruptcy Case (Ex. P-89; Trial Tr. Vol. 1 at 141; First Case Dk. No. 16). Likewise, Earwood failed to identify Kinwood or any "beneficial interest" Kinwood held in the Property anywhere on the Statement of Financial Affairs, Summary of Schedules, or any documents Earwood prepared and signed under oath as managing member of Northlake when Northlake filed its Second Bankruptcy Case (Second Case Dk. Nos. 90, 91).

(Miss. 1992) (citing 2 C.J.S. Agency § 96e). In this case, the second and third elements do not exist. Earwood attempted to convey the Property from Kinwood, an LLC in which he held a minority interest, to Northlake, an LLC in which he held 100% membership interest. Because Earwood, as 100% owner of Northlake, knew that Earwood, as minority owner of Kinwood, had no authority to act for Kinwood without the express approval of Kiniyalocts, no third party reliance existed or detrimental change of position occurred on the part of Northlake as to the Kinwood Warranty Deed from Kinwood to Northlake. BankPlus cannot rely on an apparent authority argument because BankPlus did not take its deed of trust from Kinwood.[12]

### II. The BankPlus Deed of Trust did not create a valid security interest in the Property.

Actions taken by an LLC member in contravention of the LLC Operating Agreement are null, void and of no effect. *See* Overhoff v. Scarp, Inc., 12 Misc. 3d 350, 362 (N.Y. Sup. 2005). In that Earwood lacked either express authority or apparent authority to convey the Property from Kinwood to Northlake, the Kinwood Warranty Deed was void *ab initio* and conveyed nothing.

The Kinwood Warranty Deed conveyed no interest in the Property to Northlake, and consequently, Northlake had no interest in the Property to convey to BankPlus. Thus, the BankPlus Deed of Trust, executed by Earwood on behalf of Northlake, did not create a valid security interest in the Property in favor of BankPlus.

### Conclusion

Based on the foregoing, it is evident to the Court that Earwood was able to perpetrate an ongoing fraud involving the funds and the Property of Kinwood over a prolonged period of time by

---

[12] Rather, BankPlus took its deed of trust from Northlake which held no title to the Property.

controlling all of the information and carefully disseminating only that information he wanted a specific person to know. As the preparer of Kinwood's financial statements and tax returns, he was able to construct records that hid the existence of Northlake and Novus from Kiniyalocts and masked his conversion of Kinwood assets. From the information that Earwood provided, Kiniyalocts had no reason to know that Earwood was converting Kinwood assets.

Furthermore, as Kinwood's chief negotiator with Gary Light, he was able to renegotiate contracts without raising suspicions although he had attempted to transfer the Property to Northlake. For example, after executing the Kinwood Warranty Deed, Earwood was able to conceal his fraud by carefully writing to George Kiniyalocts on Kinwood stationery and to Gary Light on Northlake stationery. Thus, Kiniyalocts would not have known Earwood had attempted to transfer the Property to Northlake, and Gary Light would not have known that the attempted transfer was fraudulent.[13]

Moreover, as an attorney, Earwood prepared all the legal documents supporting his fraud including the Kinwood Warranty Deed, the Light II contract, and the Correction and Amendment to Warranty Deed. Additionally, as the one who actually performed the title search required for the BankPlus loan, Earwood was able to convince his law partner, who signed the Title Certificate, and BankPlus, who received the Title Certificate, that title to the Property was vested in Northlake. In order to keep the fraud undetected, Earwood had to control all the information.[14]

---

[13] The evidence showed that Earwood wrote to George Kiniyalocts on Kinwood letterhead on at least eight occasions after he executed the Kinwood Warranty Deed purportedly conveying the Property to Northlake (Exs. P-32, 36, 43, 45, 46, 54, 57, 59). During this same period of time, Earwood wrote to Gary Light regarding the purchase of the Property on Northlake letterhead (Exs. P-37, 38, 39, 40).

[14] Had an independent accountant, attorney, or title abstractor become involved at any point, Earwood's fraud most likely would have been discovered earlier.

Given the Court's determination that Earwood lacked actual or apparent authority to transfer the Property and that Earwood's attempted transfer of the Property was part of a fraudulent scheme to convert Kinwood assets, the Court finds that the Amended Complaint is well taken and should be granted as follows:

A. The request for issuance of a judgment declaring the Kinwood Warranty Deed null and void and requiring it to be cancelled of record in the land records of the First Judicial District of Panola County, Mississippi, shall be and hereby is granted;

B. The request for the issuance of a judgment declaring the BankPlus Deed of Trust null and void and requiring it to be cancelled of record in the land records of the First Judicial District of Panola County, Mississippi, shall be and hereby is granted; and

C. With respect to the remaining request for relief contained in the Amended Complaint, it appears that the Plaintiffs are not seeking any additional relief and, therefore, no further relief is granted. However, if the Plaintiffs are seeking additional relief as requested in the Amended Complaint, an application for such relief should be made within ten (10) days of the date of this Memorandum Opinion and Order.

A separate final judgment consistent with this Memorandum Opinion and Order will be entered by this Court in accordance with Federal Rules of Bankruptcy Procedure 7054 and 9021.

IT IS, THEREFORE, ORDERED that the Amended Complaint hereby is granted as set forth herein.

SO ORDERED,